938 So.2d 451 (2006)
PABLO IBAR, Appellant,
v.
STATE OF FLORIDA, Appellee.
No. SC00-2043.
Supreme Court of Florida.
March 9, 2006.
Peter Raben, Miami, Florida, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida, for Appellee.
PER CURIAM.
Pablo Ibar appeals his three convictions for first-degree murder and his three sentences of death. We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the convictions and the sentences.

FACTS AND PROCEDURAL HISTORY
On August 25, 1994, Pablo Ibar and Seth Penalver were charged with three counts of first-degree murder, one count of burglary, one count of robbery, and one count of attempted robbery.[1] Penalver and Ibar were initially tried together. The first jury trial ended with a hung jury. Ibar and Penalver were eventually tried separately. Both Ibar and Penalver were ultimately convicted and sentenced to death.
On Sunday, June 26, 1994, a Palm Beach County police officer discovered a Mercedes SL convertible on fire on a road twelve miles south of South Bay. The car was registered to Casmir Sucharski,[2] owner of a nightclub called Casey's Nickelodeon. The officer who discovered the car notified the Miramar Police Department. A Miramar police officer went to Sucharski's home to tell him that his car had been found. The officer knocked on the door and received no answer. He stuck his card in the door and left.
The next morning, Monday, June 27, 1994, Marie Rogers' mother reported her missing to the Broward County Sheriff's Department. Rogers had gone to Casey's Nickelodeon on Saturday, June 25, 1994, with her friend, Sharon Anderson, and did not return home. Deputy Christopher Schaub went to Casey's Nickelodeon and learned that Sucharski left the club early Sunday morning with Rogers and Anderson. Schaub then went to Sucharski's residence. Anderson's car was in the driveway but no one answered the door. Schaub found a Miramar Police Department business card in the door and a blue T-shirt on the porch. He peered inside and saw three bodies.
The police identified the individuals found in the residence as Sucharski, Rogers, and Anderson. All three died of gunshot wounds. Because Sucharski had recently installed a video surveillance camera in his home, there was a videotape of the actual murders. The tape revealed that on Sunday, June 26, 1994, at 7:18 a.m., two men entered through the back sliding door of Sucharski's home. The intruder alleged to be Ibar initially had something covering his face, but he eventually removed it. The other intruder, alleged to be Seth Penalver, wore a cap and sunglasses, which were never removed, and carried a firearm. The videotape showed that one of the intruders had a Tec-9 semiautomatic handgun with him when he entered the home. The other intruder displayed a handgun only after he went into another room and left the camera's view. At one point, the intruder alleged to be Penalver hit Sucharski with a Tec-9 in the face, knocked him to the floor, and beat him on the neck, face, and body. This attack on Sucharski lasted for nearly twenty-two minutes. The man later identified as Ibar shot Sucharski, Rogers, and Anderson in the back of the head. The intruder alleged to be Penalver then shot Anderson and Sucharski in the back.
During this time, the intruders searched Sucharski's home. They rummaged through the home and entered the bedrooms and the garage. Sucharski was searched and his boots removed. Sucharski struggled and was repeatedly hit by both intruders. The intruders were seen putting things in their pockets. The State presented evidence that Sucharski kept ten to twenty thousand dollars in cash, carried a gun, and owned a Cartier watch. The watch was not found and Sucharski's gun holster was empty.
Police took frames from the videotape and produced a flyer that was sent to law enforcement agencies. Three weeks after the murders, the Miramar police received a call from the Metro-Dade Police Department informing them that they had a man in custody on a separate and unrelated charge who resembled the photo on the flyer. The man in custody at the Metro-Dade Police Department was Pablo Ibar. Ibar was interviewed by Miramar investigators. He told police he lived with his mother, and that on the night of the murders he had been out with his girlfriend, whom he called both Latasha and Natasha.
Ibar actually lived with several friends in a rented home on Lee Street in Hollywood, Florida. One of his roommates was Jean Klimeczko. Klimeczko initially identified Ibar and Penalver as the men on the videotape. Klimeczko told police that early on the morning of the murders, Ibar and Penalver rushed into the Lee Street home, grabbed a Tec-9 that was kept at the house, and left. At the second trial, however, Klimeczko had no memory of his earlier statements. Other witnesses who had given earlier statements to police that the men in the photo looked like Ibar and Penalver also denied making identifications.
The jury found Ibar guilty on each charge and, by a vote of nine to three, recommended a sentence of death for the murder of each victim. The trial court found the following aggravating factors: (1) Ibar was previously convicted of another felony involving the use or threat of violence to the person; (2) the capital felony was committed while Ibar was engaged in the commission of a robbery or burglary; (3) the capital felony was committed for the purposes of avoiding or preventing lawful arrest; (4) the capital felony was especially heinous, atrocious, or cruel; and (5) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
The trial court found two statutory mitigating factors: (1) Ibar had no significant history of prior criminal activity (given medium weight); and (2) Ibar's age at the time of the crime was twenty-two (given minimal weight). The trial court found nine nonstatutory mitigating factors: (1) Ibar was a good and respectful young adult; was a good, obedient and caring child; committed good deeds and had good characteristics; had a loving relationship with his mother; is a caring person (considered collectively and given medium weight); (2) Ibar is a good worker (given minimal weight); (3) Ibar can be rehabilitated in prison, is unlikely to endanger other prison inmates, and would make a peaceful adjustment to prison life (given very little weight); (4) Ibar was a good friend (given minimal weight); (5) Ibar exhibited good courtroom behavior and a good attitude (given minimal weight); (6) Ibar is religious (given minimal weight); (7) Ibar's family and friends care for and love him and he married his fiancé while in jail (given minimal weight); (8) Ibar comes from a good family (given minimal weight); and (9) Ibar expressed remorse (given minimal weight).
The trial court accepted the jury's recommendation and sentenced Ibar to death. Ibar raises eight issues in this appeal: (1) whether certain out-of-court statements were "statements of identification" as contemplated by section 90.801(2)(c), Florida Statutes (1995); (2) whether the trial court erred in admitting witness testimony for purpose of impeaching that testimony; (3) whether the trial court erred in admitting the transcript of testimony given by a deceased witness in a prior trial; (4) whether the trial court erred in allowing the State to introduce hearsay evidence and certain expert testimony; (5) whether the trial court erroneously precluded the admission of evidence regarding third-party motive and animosity and reputation evidence; (6) whether the trial court erred in allowing the admission of evidence regarding a live lineup; (7) whether the integrity of the trial was affected by references to certain evidence denying Ibar due process; (8) whether the death penalty in this case violates the Florida and Federal Constitutions. We address these issues below.

LAW AND ANALYSIS

I.

Identification Witnesses
Ibar's first two claims involve the testimony of Roxana Peguera, Marlene Vindel, Maria Casas, Jean Klimeczko, Ian Milman, Melissa Munroe, and Tanya Quiñones. He argues that the prior identifications of the defendant by Peguera, Vindel, Casas, Klimeczko, Milman, and Munroe should not have been admitted as substantive evidence. In addition, Ibar contends that these witnesses as well as Quinones were called as witnesses simply for the purpose of impeachment. The State contends the prior identifications by these witnesses were properly admitted under section 90.801(2)(c), Florida Statutes (1999). The State also argues that the defendant did not object to the six witnesses based on the theories now being advanced and therefore the issues have not been preserved for appellate review. The record reflects that the defense did object to the identification evidence in question being used as substantive evidence, but did not object to these six witnesses on the basis of being called as witnesses simply for the purpose of impeachment.
During the investigation, police showed these witnesses a photograph created from the video surveillance tape taken at the victim's home. The witnesses testified at trial that when they were initially shown the photo, they identified the person in the photo as Ibar or someone who resembled Ibar. In an attempt to show that the initial identifications were more definite, the State then called police investigators to testify that these six witnesses had actually confirmed the identity of the person in the photo as Ibar. The investigators' testimonies were not admitted as impeachment, however; they were admitted as substantive evidence under section 90.801(2)(c), Florida Statutes (1999).
We agree with the defendant that the prior identifications testified to by the officers should not have been admitted as substantive evidence under section 90.801(2)(c). Section 90.801(2)(c) provides as follows:
(2) A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is:
. . . .
(c) One of identification of a person made after perceiving the person.
This statutory provision has been interpreted by a number of courts as involving statements of identification made by a witness to or victim of a crime or event. This interpretation of the statute gives meaning to the wording of the statute and its use of the term "perceiving" and is in keeping with the interpretation given to the statute by a number of our district courts of appeal.
The Fourth District Court of Appeal in Stanford v. State, 576 So. 2d 737 (Fla. 4th DCA 1991), addressed the meaning and intent of section 90.801(2)(c). In Stanford, the trial court allowed the victim's daughter and another person to testify concerning out-of-court statements the victim made to them which included the victim naming the defendant as her assailant. The trial court allowed these statements as substantive evidence under section 90.801(2)(c), that is, statements of identification made after perceiving a person. In disagreeing with the trial court on this point, the district court said:
We believe that the typical situation contemplated by the code and the case law is one where the victim sees the assailant shortly after the criminal episode and says, "that's the man." Hence, the phrase "identification of a person made after perceiving him" refers to the witness seeing a person after the criminal episode and identifying that person as the offender. We do not believe this code provision was intended to allow other out-of-court statements by a witness to others naming the person that the witness believes committed the crime. To extend the rule that far would permit countless repetitions by a witness to others, regardless of time and place, of the witnesses' belief as to the guilty party, a result we do not believe intended by the drafters of the rule.
Id. at 739-40 (footnote omitted); see also State v. Richards, 843 So. 2d 962 (Fla. 3d DCA 2003); Simmons v. State, 782 So. 2d 1000 (Fla. 4th DCA 2001). This interpretation of the statute has continued and formed the basis of the Second District Court of Appeal's decision in Smith v. State, 880 So. 2d 730 (Fla. 2d DCA 2004).
In Smith, the Second District addressed the identical statutory provision in a situation involving witnesses to the criminal episode. At Smith's trial the State presented the testimony of several witnesses who were present in the Charleston Park neighborhood of Lee County, Florida, on the night Timmie Ray Mabry was killed. Three of the witnesses, Chad Moreland, Iris Moreland, and Jason Kafus, had given prior recorded statements to the police, and in those statements had either said they saw defendant Smith shoot the victim or saw him running with the gun shortly after the shooting. The three had also said they heard Smith say he had shot someone. However, at trial, Chad Moreland said he did not see Smith with a weapon and did not hear Smith make any incriminating statement. Iris Moreland, Chad's sister, stated at trial that she was not at the scene of the shooting and did not hear Smith make any statement. Jason Kafus testified that he was not at the scene when the shooting occurred and that he did not recall giving a statement to police.
As a result of this trial testimony, the State was allowed to call as a witness Detective Jeff Brown, the lead investigator in the case. Detective Brown had interviewed a number of witnesses in the case, including the Morelands and Kafus, and he identified the tape-recorded statements of each. The tapes were then played to the jury in their entireties. The tapes were allowed in as substantive evidence under the recorded recollection exception to the hearsay rule. The defendant was convicted of the lesser crime of manslaughter with a firearm and shooting into an occupied vehicle. On appeal and after determining that the tape recordings did not satisfy the requirements of recorded recollection, the Second District addressed the State's argument that the tape recordings were admissible as substantive evidence under section 90.801(2)(c).
In holding that only portions of the statements were admissible as substantive evidence of identification, the Second District quoted with approval a line of cases including Stanford that discussed the admissibility of evidence under section 90.801(2)(c). The cases relied on and cited by the court involved a variety of out-of-court identifications from lineups, photopaks, and showups. These cases also have one feature in commonthe person whose out-of-court identification was at issue was either a victim of or a witness to the criminal episode. For example, in Lewis v. State, 777 So. 2d 452 (Fla. 4th DCA 2001), the victim of a carjacking described his assailant to the police.[3] A short time later, the defendant was taken to the location where the victim was, and the victim identified him. At trial, the victim was unable to identify the defendant as his assailant. Over objection, the police officer was allowed to testify concerning the prior identification. On appeal the Fourth District affirmed and found the identification admissible under section 90.801(2)(c) as a statement of identification made after perceiving the defendant. The court went on to opine that one of the principles applicable to the admission of this type of identification as substantive evidence is the inherent reliability of identifications made shortly after the crime. See also A.E.B. v. State, 818 So. 2d 534 (Fla. 2d DCA 2002) (finding admissible under section 90.801(2)(c) an out-of-court identification made by a witness who saw the juvenile approach the victim's house and go into the backyard); Ferreira v. State, 692 So. 2d 264 (Fla. 5th DCA 1997) (finding admissible the eyewitness out-of-court identification of the defendant from a photographic lineup one week after the murder); Brown v. State, 413 So. 2d 414 (Fla. 5th DCA 1982) (finding admissible the victim's out-of-court statement of identification despite the fact that the victim testified at trial that he was mistaken in his prior identification). Without discussing the perimeters of section 90.801(2)(c), this Court in Evans v. State, 838 So. 2d 1090 (Fla. 2002), found admissible the out-of-court statements of identification made by two eyewitnesses to a shooting.
While other courts, most notably the federal courts, have under similarly worded statutes found admissible statements of identification made by persons other than victims and witnesses to the crime, we believe the view espoused by our district courts will better serve the ends of justice. To expand the rule to allow as substantive evidence an out-of-court identification made by anyone who sees or is shown a picture of the defendant could result in the defendant being convicted through the testimony of persons who have no relationship or connection to the criminal offense. As the Stanford court also opined, expansion of the rule could lead to an endless repetition of out-of-court identifications.
Although Ian Milman's prior testimony concerning identification was not admissible as substantive evidence under section 90.801(2)(c), it was admissible as substantive evidence under section 90.801(2)(a). Section 90.801(2)(a) provides that an out-of-court statement is not hearsay if the declarant, in this case Milman, testifies at the trial and is subject to cross-examination about the statement. In addition, the prior statement must be made under oath at a trial, hearing, or other proceeding or in a deposition. Lastly, the prior statement must be inconsistent with the declarant's present testimony.
Milman testified at Ibar's second trial that he was shown photos and initialed them just to show that he looked at them. Milman said that the man in the still photo was not Ibar; he indicated that he never said the person was Ibar and had never said it was Ibar at the grand jury proceeding. Detective Paul Manzella testified that Milman positively identified Ibar. The State impeached Milman using the grand jury transcript. The trial judge dismissed the jury from the courtroom and then discussed Milman's prior grand jury testimony with the parties. The judge pointed to the language in Milman's grand jury testimony that specifically contradicted his trial testimony. Thus, the trial judge was within his discretion in determining that Milman's identification of Ibar was admissible as substantive evidence. See Johnston v. State, 863 So. 2d 271 (Fla. 2003) (holding that a trial judge's ruling on the admissibility of evidence will not be disturbed on appeal absent an abuse of discretion).
We also find that Melissa Munroe's prior identification statement was also admissible as substantive evidence under section 90.801(2)(a). Munroe was living with Penalver at the time of the crime. She had previously told police that the man in the still photo resembled Ibar and she signed the back of the photo. At trial, the State questioned Munroe about whether she had seen Penalver and Ibar the weekend of the murders. Munroe said she did not remember when she had seen them together, but that it could have been a month or two before she read about the murders in the newspaper. The State attempted to impeach Munroe with her previous grand jury testimony. Munroe explained that what she previously told the grand jury was not inconsistent with her trial testimony because the police initially manipulated her statements. She explained that she just continued to go along with what the police initially wrote in their report. As with Milman, the trial judge deemed Munroe a "turncoat witness." With this finding, the judge allowed Munroe's prior testimony to be admitted for its truth under section 90.801(2)(a).
Statements made under oath include those statements made at grand jury proceedings. See State v. Green, 667 So. 2d 756, 759 (Fla. 1995). At trial, the prosecutor showed Munroe the same photos that had been shown to her at the grand jury proceeding and asked her to indicate whether the person in the photos looked like Ibar. When Munroe said "no," the prosecutor then read from Munroe's 1994 grand jury testimony, which stated that the persons in the photos looked like Ibar and Penalver. Munroe's trial testimony is inconsistent with her prior grand jury testimony. The grand jury testimony is therefore admissible for its substantive value as an exception to the hearsay rule under section 90.801(2)(a). The trial judge did not abuse his discretion in admitting Munroe's prior identification as substantive evidence.
Although the trial judge erred in allowing several of the identification statements to be considered as substantive evidence, we find the error harmless. See State v. DiGuilio, 491 So. 2d 1129 (Fla. 1986). In DiGuilio, we explained that the State, as the beneficiary of any error, must demonstrate beyond a reasonable doubt that the complained-of errors did not contribute to the verdict. That is to say, the State must prove that "there is no reasonable possibility that the error contributed to the conviction." Id. at 1135 (citing Chapman v. California, 386 U.S. 18 (1967)).
A close examination of the evidence presented in this case, both the properly admitted and the inadmissible evidence, demonstrates the harmlessness of the error in this instance. In addition to the statements of Peguera, Vindel, Casas, and Klimeczko identifying Ibar, which Ibar concedes was proper as impeachment evidence but not substantive evidence, there were other witnesses and items of evidence from which the jury could conclude that Ibar was one of the perpetrators of this triple homicide. First, there was a videotape of the murders. The perpetrator identified as Ibar removed his disguise and his face was visible on the videotape. This videotape was played for the jury. Gary Foy, one of Sucharski's neighbors, testified that he saw two men leaving in Sucharski's Mercedes-Benz. He stated that he did not get a good look at the driver of the car, but he got a good look at the passenger. Foy identified Ibar as the passenger in the Mercedes. Klimeczko testified that at some point both Penalver and Ibar came to the residence on Lee Street in a big, black, shiny new car. Although Milman denied that he had ever positively identified Ibar as the person in the still photograph made from the videotape, he did say that the person in the photograph resembled Ibar. Moreover, the trial judge admitted as substantive evidence Milman's grand jury testimony in which he positively identified Ibar. Munroe's statement placing Ibar and Penalver together during the weekend of the murder was also admitted as substantive evidence. On the issue of identification, the jury also heard evidence from Kimberly San and David Phillips that placed Ibar and Penalver in the Mercedes. Both Peguera and her mother testified that the person in the photograph resembled Ibar. We conclude that any error in admitting some of these identification statements as substantive evidence rather than as impeachment evidence was harmless error. DiGuilio, 491 So. 2d at 1135.
We agree with the State that the defendant's claim that the witnesses were called for the sole purpose of impeaching their testimony is not a matter that has been preserved for appellate review because there was no objection made on this basis in the trial court. See Steinhorst v. State, 412 So. 2d 332, 338 (Fla. 1982) ("[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for objection, exception, or motion below."). Moreover, while parts of these witnesses' testimonies were impeached, there was other evidence gleaned from these witnesses that was not impeached and was used by the State to put together the various pieces of evidence that linked Ibar to these murders.

II.

Prior Testimony/Unavailable Witness
Ibar next alleges it was error to allow his mother's testimony from his first trial to be read to the jury in this trial because the jury was unable to personally witness his mother, Maria Casas, testify, and assess her credibility. He also argues that it was error to allow the testimony to be read because at the first trial, his mother vehemently denied that she identified Ibar in a photo; therefore, the only purpose for reading this testimony was to open the door for the State to call its own witness to testify that she made an identification during the investigation. Ibar credits his mother Maria Casas's testimony at the first trial for resulting in a hung jury because she so vehemently denied identifying him in the surveillance photo.
"The use of prior testimony is allowed where (1) the testimony was taken in the course of a judicial proceeding; (2) the party against whom the evidence is being offered was a party in the former proceeding; (3) the issues in the prior case are similar to those in the case at hand; and (4) a substantial reason is shown why the original witness is not available." Thompson v. State, 619 So. 2d 261, 265 (Fla. 1993) (citing Hitchcock v. State, 578 So. 2d 685 (Fla. 1990); Johns-Manville Sales Corp. v. Janssens, 463 So. 2d 242 (Fla. 1st DCA 1984); Layton v. State, 348 So. 2d 1242 (Fla. 1st DCA 1977)). Casas's testimony meets all four elements and was admissible on this basis.
The first trial was a judicial proceeding, and Casas was subject to cross-examination on substantially the same issues involved in this trial. Casas's unavailability at the second trial is undisputed due to her death. Thus, all the elements of Thompson have been satisfied.
Furthermore, Ibar failed to properly preserve this issue for review. Defense counsel objected that the photo Casas discussed at the first trial was never marked for identification. Thus, the objection at trial is not the same as the issue raised on appeal. Therefore, the issue was not properly reserved for our review. See Morrison v. State, 818 So. 2d 432, 446 (Fla. 2002). For these reasons, we deny relief on this claim.

III.

Admission of Hearsay Evidence
Ibar makes several claims concerning the admission of testimony from Ian Milman, Kimberly San, and Fred Boyde. He alleges that Milman's testimony concerning a statement made by Alex Hernandez and San's testimony that Ibar identified himself were inadmissible hearsay. Additionally, he argues that the testimony of the State's shoe print expert should not have been admitted because the evidence has no basis in science.
Ibar contends the trial court erroneously permitted Milman to testify that Alex Hernandez stated his intention to travel to North Carolina on the weekend of the murders. Ibar alleges that Hernandez was not properly investigated and could not be ruled out as a suspect. In order to show that Hernandez was out of town and was therefore properly eliminated as a suspect, the State introduced testimony from Milman, another tenant at the Lee Street home. The defense objected to the evidence, arguing it was inadmissible hearsay and not an exception to the hearsay rule. The trial court allowed the testimony under section 90.803(3), Florida Statutes (1999), as pertaining to Hernandez's state of mind that he intended to go out of town on the weekend of the murders.
Section 90.803(3) provides, in pertinent part:
[T]he following are not inadmissible as evidence, even though the declarant is available as a witness:
. . . .
(3) Then-existing mental, emotional, or physical condition.
(a) A statement of the declarant's then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
. . . .
2. Prove or explain subsequent acts of subsequent conduct of the declarant.
§ 90.803(3), Fla. Stat. (1999).
A hearsay statement of intent or plan is admissible under section 90.803(3) when offered to "[p]rove or explain acts of subsequent conduct of the declarant." § 90.803(3)(a)(2). In this case, the statement that Hernandez planned to go to North Carolina was offered to prove that he subsequently went to North Carolina. While this is the kind of testimony contemplated by the rule, such a statement is only admissible if there is other sufficient evidence to draw the inference that the act or plan was executed. See Charles W. Ehrhardt, Florida Evidence, § 803.3b, at 788 (2005).
Several Florida cases discuss this hearsay exception and illustrate its proper application. In Muhammad v. State, 782 So. 2d 343, 359 (Fla. 2001), a mother testified that she was talking on the phone to her son when he was killed. When the State asked the mother what the son was talking about, the mother testified that her son was on his way to the courthouse to get a business license and that he expressed excitement about his future. This Court indicated that the evidence was inadmissible because the son's statement was not offered to prove he subsequently went to the courthouse, it was offered to prove that he was excited about his future and would garner sympathy from the jury. Id. at 359. Thus, the admission of the statement fell outside of the purpose of the rule, i.e., to prove a subsequent act. Likewise in Brooks v. State, 787 So. 2d 765 (Fla. 2001), the State introduced the victim's hearsay statement that she was going to Crestview with her boyfriend, who was not the defendant Brooks. This Court found that statements of intent under this exception were only admissible to indicate the future act of the declarant, not the future act of another person. Id. at 770-71. Thus, the victim's statement of intent to go to Crestview with her boyfriend could only be used to show she went to Crestview with her boyfriend. Because the evidence was offered to show that the defendant followed the victim and her boyfriend to Crestview, it was inadmissible. See id.
In contrast, in Monlyn v. State, 705 So. 2d 1 (Fla. 1997), this Court found a hearsay statement made by the defendant to a fellow inmate to be admissible under this hearsay exception. An inmate at the jail testified that on the day before Monlyn escaped from jail, Monlyn told him that he was going to escape, get a shotgun, and kill the first person he saw with a car. In affirming the trial court's denial of Monlyn's motion to suppress the statement, we said, "This is exactly the kind of evidence contemplated by section 90.803(3)(a)2 . . . as satisfying the state of mind exception to explain subsequent conduct." Id. at 5.[4]
These cases illustrate that statements admitted under the state of mind exception to the hearsay rule are properly admitted only if they involve the state of mind of the declarant and there is evidence demonstrating that the declarant acted in accord with the state of mind or intent. In this case, Hernandez's state of mind, his "intention" to go to North Carolina, is relevant to the intermediate issue of whether he was in town and could have committed the murders. If there is sufficient evidence to draw the inference that he went to North Carolina, and the evidence is offered for that purpose, then the evidence would be admissible. The only evidence offered by the State in this case is Milman's testimony that Hernandez returned home on Sunday and the hearsay statement made by Hernandez to Milman about taking a plane home. There is nothing else in this record to support the inference that Hernandez actually went to North Carolina. Cf. Monlyn, 705 So. 2d at 3 (indicating the evidence demonstrating that Monlyn committed the acts expressed in the hearsay statement). Here, however, the gap between the stated intention and the actual commission of the act is too great to support an inference that Hernandez was in North Carolina at the time the murders were committed. Thus, the trial court should not have admitted the evidence under the state of mind exception to the hearsay rule.
However, the error of admitting this evidence is harmless. This Court has defined the harmless error test as placing "the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So. 2d at 1135. The commission of an error by the trial court is only considered harmless where there is no reasonable possibility that the error contributed to the verdict. See Walton v. State, 847 So. 2d 438, 446 (Fla. 2003). Considering this error in light of the evidence the jury properly had in front of it, there is no reasonable possibility that the error contributed to the conviction. There was a wealth of evidence that connected Ibar to this crime and indicated that he was one of the intruders captured on videotape at the scene of the murders. The question of whether Hernandez was or was not out of town at the time of the murders would not have reasonably affected the jury's finding that Ibar was one of the murderers.
Ibar next argues that the trial court erroneously admitted the testimony of Kim San that she saw Ibar in her home on the Sunday morning of the murders. San testified that Penalver and Ibar came to her house that morning in a black Mercedes. San knew Penalver because they were living together. But when she saw the other man, she asked, "Who the hell are you?" Defense counsel objected to this testimony on the basis of hearsay. At that point, however, San had not given a hearsay statement. When the prosecutor asked, "Well, did this person respond?" San responded, "He said, yes, I'm Pablo." Defense counsel again objected, arguing that the statement "I'm Pablo" was hearsay. The State argued that it was a spontaneous statement. The court overruled the objection. Later, San repeated the statement, and defense counsel objected on relevancy grounds. The hearsay exceptions statute, section 90.803 provides that various types of evidence are not inadmissible, including spontaneous statements, defined as follows:
(1) Spontaneous statement.  A spontaneous statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, except when such statement is made under circumstances that indicate its lack of trustworthiness.
§ 90.803(1), Fla. Stat. (1999). A spontaneous statement must be made "at the time of, or immediately following, the declarant's observation of the event or condition described." J.M. v. State, 665 So. 2d 1135, 1137 (Fla. 5th DCA 1996). This exception requires that "the statement must be made without the declarant first engaging in reflective thought." Id. The statements admitted under section 90.803(1) are limited to statements which "describe or explain" an event. Charles W. Ehrhardt, Florida Evidence § 803.1, at 772 (2005 ed.). Ibar's statement "I'm Pablo" did not "describe or explain" an event. The two cases the State cites in support both demonstrate that the declarant responded to an event. See McGauley v. State, 638 So. 2d 973, 974 (Fla. 4th DCA 1994) (holding that wife's response to officer's question "Who jumped out of the back window?," which identified the defendant, was a spontaneous statement); McDonald v. State, 578 So. 2d 371, 373 (Fla. 1st DCA 1991) (holding that the victim's statement to her friend in a sexual battery case immediately after the incident was admissible as a spontaneous statement). Because the statement "I'm Pablo" did not describe or explain an event, the trial court should have sustained the objection.
Although we find the statement inadmissible as a spontaneous statement, we find it was admissible as an admission by the defendant pursuant to section 90.803(18), Florida Statutes (1999). This exception to the hearsay rule provides for the admission into evidence of a statement by a party that is offered against that party. It is undisputed that the statement was made by the defendant and it was being offered against him. Therefore, it was admissible under 90.803(18).
Ibar also challenges the State's footwear impression expert. He argues that courts are reconsidering this type of identification testimony on the ground that it has no basis in science. Ibar cites federal and other state cases that follow Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), as the standard for the admissibility of experts' testimony. Florida courts do not follow Daubert, but instead follow the test set out in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923). See Brim v. State, 695 So. 2d 268, 275 (Fla. 1997). Frye sets forth the test to be utilized when a party seeks the admission of expert testimony concerning new or novel scientific evidence. In this case, however, there was no new or novel scientific theory being presented by the shoe print expert. Thus, neither Daubert nor Frye is applicable. This case is similar to Spann v. State, 857 So. 2d 845 (Fla. 2003), where this Court held that a Frye hearing was not necessary for the admission of an expert's testimony on handwriting analysis because handwriting analysis has been utilized by the courts for over 100 years and is not a new or novel science. Shoe print evidence has been utilized for at least as long. See, e.g., Whetson v. State, 12 So. 661 (Fla. 1893) (explaining that footprints found at or near the scene of a crime which correspond to those of the accused can be admitted into evidence). The use and reliance on footprint evidence is not new or novel and is not subject to Frye analysis. Thus, there was no error in the trial court's admission of this testimony.

IV.

Exclusion of Answering Machine Audiotape
Ibar next argues that the trial court erroneously precluded the defense from eliciting evidence of a third-party motive and the poor reputation for veracity of a State's witness. Ibar sought to introduce as evidence a tape recording made on Sucharski's answering machine just days before the murders. In that recording Sucharski's ex-live-in girlfriend Kristal Fisher called Sucharski and wanted to get her clothes and jewelry from his house. A transcript of the recording indicates that the two fought about the clothes and jewelry and about Fisher's new boyfriend.
Section 934.06, Florida Statutes (1999), prohibits the contents of an intercepted communication from being received in evidence in any trial "if the disclosure of that information would be in violation of this chapter." A lawful interception of communications occurs when all of the parties to the communication have given prior consent. See § 934.03(2)(d), Fla. Stat. (1999). There is no indication in the tape or the testimony that Fisher knew Sucharski was taping their conversation. Defense counsel wanted to introduce the taped conversation through the testimony of Sucharski's employee Peter Bednarz, who could identify Sucharski's and Fisher's voices, and who knew that they were fighting. Bednarz was not a party to the phone conversation; nor was Fisher called by either party to testify at trial. Because there was no evidence that Fisher knew of the recording, the trial court's refusal to admit the recording was not an abuse of discretion.

V.

Reputation Testimony Regarding Kimberly San
Ibar next argues that defense counsel should have been permitted to impeach Kimberly San's credibility. As discussed above, San testified for the State that Penalver and someone else who said he was Pablo showed up at her house in a black Mercedes on the morning of the murders. Ibar proffered the testimony of Robert James Lillie, a Margate police officer who had, in the past, come into contact with San in his capacity as a police officer. Lillie would have testified that San "is not a truthful, truth telling person. She's a liar." Lillie's opinion was based on information from a secretary at the prosecutor's office that San made untrue accusations against Lillie. The secretary did not live in San's community. Lillie also stated that San's mother and brother expressed opinions that San was not truthful. The trial court did not allow the testimony, finding that the testimony was not based on the perception of the community, but only on the opinions of a small number of people.
Section 90.609, Florida Statutes (1999), provides as follows:
A party may attack or support the credibility of a witness, including an accused, by evidence in the form of reputation, except that:
(1) The evidence may refer only to character relating to truthfulness.
(2) Evidence of a truthful character is admissible only after the character of the witness for truthfulness has been attacked by reputation evidence.
As a predicate to the introduction of such reputation evidence, however, section 90.405, Florida Statutes (1999), requires the witness to be aware of the person's general reputation in the community and that the community must be sufficiently broad to provide adequate knowledge and a reliable assessment. See Larzelere v. State, 676 So. 2d 394 (Fla. 1996); Charles W. Ehrhardt, Florida Evidence, § 405.1, at 257-58 (2005 ed.). Lillie testified that he had known San and her family for many years, but the reputation testimony came only from his discussion with San's brother, mother, and an employee of the State Attorney's office who did not live in the community. In light of these limitations, the trial court did not abuse its discretion in excluding the evidence. See Larzelere, 676 So. 2d at 400 (finding no abuse of discretion for the exclusion of reputation evidence when the evidence came from a limited community).

VI.

Motion to Suppress Lineup Evidence
Ibar contends the trial court erroneously denied his motion to suppress the live lineup and the statements made by Gary Foy identifying him at that lineup. He alleges that he was "in custody" at the time Miramar police arrived at the Miami-Dade homicide unit with a warrant requiring him to participate in a lineup. Ibar requested his counsel be present for the lineup, but police told him that they did not want to wait for his counsel to arrive and they proceeded without counsel. The State argues that Ibar was not in the custody of the Miramar police on the triple homicide and had not been charged on these crimes; therefore, Ibar's right to counsel had not been triggered.
In reviewing the trial court's ruling on a motion to suppress, we accord a presumption of correctness to the trial court's determination of historical facts; however, we independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendments and, by extension, article I, section 9 of the Florida Constitution. See Connor v. State, 803 So. 2d 598, 608 (Fla. 2001).
"Under the state constitution, a defendant's right to counsel's presence applies at each crucial stage of the proceedings; under the federal constitution, defendant is entitled to counsel at each critical stage of the proceeding." State v. Jones, 849 So. 2d 438, 441 (Fla. 3d DCA 2003) (citing Smith v. State, 699 So. 2d 629, 638 (Fla. 1997)); see also Traylor v. State, 596 So. 2d 957, 968 (Fla. 1992). Although "[i]t is well settled that viewing a post-charge/arrest live lineup is a critical or crucial stage," Jones, 849 So. 2d at 441, a pre-charge lineup is not a critical or crucial stage because formal proceedings have not actually begun. The United States Supreme Court has stated that the formal proceedings begin when the government makes a commitment to prosecute, which occurs when the defendant is arraigned, indicted, or formally charged. See Kirby v. Illinois, 406 U.S. 682, 688-91 (1972) (plurality opinion) (holding that a lineup conducted after a defendant's arrest, but before arraignment, indictment, or formal charges is merely investigatory in nature; therefore, the defendant is not entitled to presence of counsel at such a lineup). When the government makes a formal commitment to prosecute, the Sixth Amendment right to counsel attaches. See id. at 689 ("[I]t is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified."). The pre-arrest investigatory lineup in this case was not a "critical stage" of the proceedings because when the lineup was conducted, it was not apparent that the government had decided to prosecute Ibar for the triple homicide.
Ibar maintains that his arrest in Dade County on unrelated charges established that he was "in custody" or "under arrest." The right to counsel when an accused or suspect is "in custody" or "under arrest" applies when there is an official interrogation, in which case the Fifth Amendment right to counsel is triggered and Miranda[5] warnings are given. See Sapp v. State, 690 So. 2d 581 So. 2d 581, 585 (Fla. 1997). An official interrogation refers to words or actions that are reasonably likely to elicit an incriminating response from the suspect. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980). A prearrest investigatory lineup does not elicit any response from the suspect; therefore, it is not an interrogation and the Fifth Amendment right to counsel is not triggered.
Furthermore, the Sixth Amendment right to the assistance of counsel is "offense specific" and applies only to the offense or offenses with which the defendant has actually been charged, and not to any other offense he may have committed but with which he has not been charged. See, e.g., Hendricks v. Vasquez, 974 F.2d 1099 (9th Cir. 1992); West v. State, 923 P.2d 110 (Alaska Ct. App. 1996) (holding that the fact that the right to the assistance of counsel has attached in a particular case does not entitle the defendant to demand representation in connection with factually and legally unrelated matters in which the state has made no accusation and taken no adversary action); State v. Williams, 922 S.W.2d 845 (Mo. Ct. App. 1996) (holding that in a murder prosecution, the defendant's Sixth Amendment right to counsel for an unrelated murder had not attached where no formal proceedings had been brought against him for that murder). At the time Ibar was subjected to the live lineup, he had not been charged for the triple homicide and his Sixth Amendment right to counsel had not been triggered. Therefore, the trial court properly denied Ibar's motion to suppress.

VII.

Motions for Mistrial
Ibar raises several issues concerning the admission of evidence that he alleges should have resulted in a mistrial. Manzella testified that the first lead in solving this case came from the Miami-Dade County police homicide unit. Ibar argues that it was improperly admitted evidence because the jury could have inferred that Ibar was being held on another homicide in Miami. Ibar argues that the trial court erred in failing to grant his motion for mistrial based on this evidence. There was no objection made to this testimony at the time it was admitted. Counsel only raised an objection in a sidebar discussion on another topic. In fact, during the initial stage of the sidebar conference, defense counsel said he did not object to the testimony. However, later in the discussion defense counsel said he did object but had not objected at the time because he did not want to draw the jury's attention to the fact that Ibar was in the Miami-Dade homicide unit. It was only at this point that defense counsel objected and moved for a mistrial.
A motion for a mistrial is addressed to the sound discretion of the trial judge, and the trial judge's ruling on such a motion will not be reversed absent an abuse of discretion. See Anderson v. State, 841 So. 2d 390 (Fla. 2003). Generally, the objecting party should both move to strike the improper testimony and request a curative instruction telling the jury to disregard the improper testimony. See Ferguson v. State, 417 So. 2d 639 (Fla. 1982); Williams v. State, 443 So. 2d 1053 (Fla. 1st DCA 1984). In this instance, defense counsel simply objected, after the fact, and requested a mistrial. No request was made for a curative instruction. Under these circumstances we cannot say that the trial judge abused his discretion in denying the motion for mistrial.
Ibar next claims that it was error for the jury to hear that Ibar had a fight with Klimeczko over money and drugs. When Detective Manzella made a reference to drugs at the Lee Street home during his trial testimony, defense counsel moved for mistrial based on the fact that the trial judge had precluded Klimeczko from making any reference to the fact that a dispute over drugs was the reason Ibar kicked him out of the Lee Street house. The trial court denied the motion and found that Manzella's statement was sufficiently vague in that there was no indication from the statement that Klimeczko stole drugs from Ibar.
A mistrial should be granted only in circumstances where "the error committed was so prejudicial as to vitiate the entire trial." Duest v. State, 462 So. 2d 446, 448 (Fla. 1985). When taken in context, the officer's limited reference to notes he made while interviewing a witness did not amount to the admission of Williams[6] rule evidence. As the trial court found, Ibar kicked Klimeczko out because he took money and drugs, but there is no indication whose money and drugs Klimeczko took. Since the testimony on this case was that at least four men lived in the Lee Street house, any one of them could have been the owner of the money and drugs. Under these circumstances, we cannot say that Manzella's reference affected the outcome of the trial.
Ibar further alleges the trial court should have granted his motion for a mistrial because Manzella made a statement that constituted a comment on Ibar's right to remain silent. Manzella testified that during his interrogation of Ibar he sensed that Ibar did not want to communicate with him so he showed Ibar the surveillance photo and asked Ibar, "How did I get this?" Defense counsel objected and moved for a mistrial. In response, the State offered to clarify the officer's statement with further questioning. The court denied Ibar's motion for mistrial. The State continued questioning Manzella, and Manzella explained that because he was getting limited information from Ibar during questioning, he showed Ibar the photo. He asked Ibar how he got the photo. Defense counsel objected again.
We have held that commenting on a defendant's exercise of his right to remain silent is serious error. See Rimmer v. State, 825 So. 2d 304, 322 (Fla. 2002). The test to be applied in such instances is whether the statement is fairly susceptible of being interpreted by the jury as a comment on the defendant's exercise of that right. See id. at 323 (citing State v. Kinchen, 490 So. 2d 21, 22 (Fla. 1985)). Additionally, once a suspect initially waives his or her Miranda rights, the suspect must "clearly" invoke the right to terminate questioning. See, e.g., State v. Owen, 696 So. 2d 715 (Fla. 1997).
The trial judge correctly found that Ibar did not clearly invoke his right to terminate questioning. While Ibar may have been somewhat reluctant and evasive in answering some questions, he continued to talk to and cooperate with the police and even signed a consent to permit a search of his residence. Thus, the officer's recitation of these events was not a comment on Ibar's right to remain silent. The trial judge did not abuse his discretion in denying the motion for mistrial. See Goodwin v. State, 751 So. 2d 537 (Fla. 1999).[7]
Ibar also argues the trial court improperly allowed the State to introduce references to codefendant Penalver's gang affiliation, criminal history, and evidence of consciousness of guilt. This testimony was presented during the testimony of Detective Mark Suchomel, who was asked about a search conducted at the home of Melissa Munroe. Detective Suchomel was asked to outline the items taken during the search. Included in the items removed, Detective Suchomel listed a soccer ball with gang graffiti and a Department of Corrections offender identification card with Penalver's name. Defense counsel did not object while the detective was testifying. Only after Detective Suchomel testified did counsel request a sidebar, object, and moved for a mistrial. Counsel did not request a limiting instruction.
The objection in this case came well after the offending testimony was elicited. Counsel did not attempt to stop the officer during his recitation of the evidence found in the search. Thus, the defendant never gave the trial judge an opportunity to rule on the admissibility of the evidence. See Rowe v. State, 163 So. 22, 23 (Fla. 1935) (indicating that the purpose of an objection is to prevent a question from being answered until after a ruling of the court can be obtained); Charles W. Ehrhardt, Florida Evidence, § 104.1, at 21 (2005 ed.). Moreover, the defendant did not request a curative instruction. See Williams v. State, 443 So. 2d 1053, 1054 (Fla. 1st DCA 1984) (holding that where the objectionable evidence is not of such an inflammatory nature as to deny a fair trial, the proper procedure is to object and request a curative instruction). Therefore, we cannot say under the circumstances presented here that the trial judge abused his discretion in denying the motion for mistrial.

VIII.

Sentencing Issues
Finally, Ibar raises several claims involving the sentencing phase of his trial, including the constitutionality of the death penalty. The jury found Ibar guilty of three counts of first-degree murder and single counts of armed burglary, armed robbery and attempted armed robbery. The penalty phase jury recommended a sentence of death by a nine-to-three vote on each of the murder counts. The judge sentenced Ibar to death on each of the three murder counts. Ibar was also sentenced to twenty-five years for armed burglary, twenty-five years for armed robbery, and ten years for attempted armed robbery. Two of the five aggravators were based on prior felonies (contemporaneous murder and that the murders were committed in the course of a felony).
Ibar argues that the Florida system unconstitutionally relies upon judicial fact-finding and not jury fact-finding. This claim, and variations of this claim, have been addressed and decided adversely to Ibar. See Duest v. State, 855 So. 2d 33, 49 (Fla. 2003); Blackwelder v. State, 851 So. 2d 650, 654 (Fla. 2003). Ibar also claims that the advisory role of the jury is unconstitutional and that the jury misunderstands its role. These claims have also been addressed and decided adversely to Ibar. See Jones v. State, 855 So.2d 611, 619 n. 5 (Fla. 2003).
Ibar also takes exception to the limitation the trial court put on defense counsel's arguments to the jury and argues that it was unconstitutional to prohibit defense counsel from asking the jury for mercy, asking for a jury pardon, discussing whether the jury had lingering doubt, or eliciting personal opinions about the death penalty from witnesses. Ibar argues that these prohibitions should be revisited in light of Ring v. Arizona, 536 U.S. 584 (2002). It is improper for the court to consider lingering doubt or residual doubt as a mitigating factor. See Darling v. State, 808 So. 2d 145, 162 (Fla. 2002); Sims v. State, 681 So. 2d 1112, 1117 (Fla. 1996); Preston v. State, 607 So. 2d 404-411 (Fla. 1992); Aldridge v. State, 503 So. 2d 1257, 1259 (Fla. 1987). Moreover, it is improper for a defendant to relitigate the determination of his guilt by presenting evidence of or arguing lingering doubt. See Duest v. State, 855 So. 2d at 40. This principle has not changed since Ring, and there is nothing in the Ring decision that would require a different result.
Ibar argues that the lack of unanimity in the jury recommendation is unconstitutional. This claim has been addressed and decided adversely to Ibar. See Blackwelder 851 So. 2d at 654. Ibar also argues that the indictment was defective because it did not provide notice of the aggravators, and he argues that the verdict forms should have indicated which aggravators were found by the jury. These claims have also been addressed adversely to Ibar. See Kormondy v. State, 845 So. 2d 41, 54 (Fla. 2003) ("Ring does not require either notice of the aggravating factors that the State will present at sentencing or a special verdict form indicating the aggravating factors found by the jury.").
Next, Ibar argues that there was insufficient evidence of the existence of the aggravating circumstances to support his sentence. He argues that the cold, calculated, and premeditated (CCP) aggravator, the avoid arrest aggravator, and the heinous, atrocious, or cruel (HAC) aggravator were not proven beyond a reasonable doubt. He also argues that when these aggravators are eliminated, his death sentence is not proportional. We find no merit to these claims.
Ibar claims the trial court improperly found CCP in this case because there was no heightened state of premeditated design to kill because, as the video demonstrates, the murders happened very quickly. This Court recently set forth a thorough discussion of CCP in Lynch v. State, 841 So. 2d 362 (Fla. 2003), defining each element of CCP. The murders in the instant case meet the cold element of CCP, as set forth in Lynch, because they were execution-style killings. See also Walls v. State, 641 So. 2d 381, 388 (Fla. 1994). In addition, as in Walls, Ibar and his accomplice had ample opportunity to reflect on their actions and abort any intent to kill. But instead they shot each victim in the back of the head. "As to the `calculated' element of CCP, this Court has held that where a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill, the element of `calculated' is supported." Lynch, 841 So. 2d at 372. According to the testimony of Klimeczko, Ibar and Penalver arrived at the Lee Street home and took the Tec-9 gun early on Sunday morning. At one point during the murders, the gunman with the hat and sunglasses went into a bedroom and came out with a second gun. During this time, Ibar had time to reflect on the killings. There was also "heightened premeditation" in this case. This element has been found when a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder anyway. See Alston v. State, 723 So. 2d 148, 162 (Fla. 1998). Because the videotape shows that the murders were not committed immediately upon the intruders' entrance to the home, that the victims were tied up, and that Sucharski was beaten for more than twenty minutes, it is evident that the defendants could have left the scene before killing the three victims. Thus, the calculated element of CCP is met. The final element of CCP is a lack of legal or moral justification. "A pretense of legal or moral justification is `any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.'" Nelson v. State, 748 So. 2d 237, 245 (Fla. 1999) (quoting Walls v. State, 641 So. 2d 381, 388 (Fla. 1994)). In this case, there is no legal or moral justification posited for these killings. Thus, the CCP aggravator was properly found.
Next, Ibar claims that there was no evidence that he was attempting to avoid arrest when he committed these crimes. He argues that the avoid arrest aggravator was erroneously found because the victims were not law enforcement officers. He contends that there was no positive evidence of witness elimination, but a mere hypothesis. In evaluating the avoid arrest aggravator, this Court
will look at whether the victims knew and could identify their killer, but . . . this fact alone is insufficient to prove the aggravator beyond a reasonable doubt. See Farina v. State, 801 So. 2d 44, 54 (Fla. 2001). We have held that the following evidence is also pertinent when reviewing this aggravator: "[W]hether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant." Id.
Nelson v. State, 850 So. 2d 514, 526 (Fla. 2003). In the instant case, there was record testimony that Ibar often frequented Sucharski's bar and that Sucharski videotaped events at the bar and frequently reviewed them. There is also evidence that Sucharski may have recognized Ibar from shaking hands with him at the bar. That information, coupled with the fact that Ibar wore something over his head to conceal his identity, the fact that Sucharski resisted, and that the victims were confined, all support this aggravator. Thus, we conclude that the avoid arrest aggravator was also properly found.
Ibar next argues that HAC was erroneously found because the State did not present evidence of mental torture. Instantaneous or near instantaneous deaths by gunshot, unaccompanied by additional acts to mentally or physically torture the victim, does not meet the requirements of HAC. See Rimmer v. State, 825 So. 2d 304, 327-28 (Fla. 2002); see also Ferrell v. State, 686 So. 2d 1324, 1330 (Fla. 1996) ("Execution-style killings are not generally HAC unless the state has presented other evidence to show some physical or mental torture of the victim."). However, the acts of mental and physical torture are depicted on the videotape in this case. Ibar and his accomplice entered the home and beat Sucharski almost continually until shooting him. Sucharski suffered blunt injuries to his head, face, neck, teeth, and hands. His index finger was fractured. After fourteen and a half minutes, he was shot. The women were lying on the floor, face down. They saw and heard all of the injuries inflicted on Sucharski. At one point, Rogers was pushed to the floor near the kitchen table. Anderson tried to escape to the bedroom but was chased by Ibar and then tied with electrical cords. After another seven minutes, all of the victims were shot. These deaths were not "instantaneous" or "near instantaneous." The videotape demonstrates that the men tortured the victims, either physically or mentally, for some time.
Finally, we review the sentences for proportionality. In this case, we find the sentences of death are proportional. The State relies on Rimmer v. State, 825 So. 2d 304 (Fla. 2000), Alston v. State, 723 So. 2d 148 (Fla. 1998), and Bush v. State, 682 So. 2d 85 (Fla. 1996), to support its argument that death is the appropriate penalty in these cases. In Rimmer, the defendant was convicted of first-degree murder for the execution-style killings of two employees of a car stereo store. See 825 So. 2d at 308. The criminal episode lasted for fifteen to twenty minutes. See id. at 310. The trial court found six aggravating factors: "(1) the murders were committed by a person convicted of a felony and under a sentence of imprisonment; (2) the defendant was previously convicted of another capital felony and a felony involving use or threat of violence to the person; (3) the murders were committed while the defendant was engaged in a robbery and kidnaping; (4) the murders were committed for the purpose of avoiding or preventing lawful arrest; (5) the murders were especially heinous, atrocious, or cruel (HAC); and (6) the murders were cold, calculated, and premeditated (CCP)." Id. at 311. The trial court found no statutory mitigation and five nonstatutory mitigators. This Court affirmed Rimmer's conviction and sentence. Id. at 332.
Bush and Alston involved execution-style murders as well. In Bush, this Court affirmed a death sentence where the trial court found three aggravatorsprior violent felony, murder committed during a felony, and CCPand no mitigators. See 682 So. 2d at 86. In Alston, the trial court found five aggravators: prior violent felonies; the murder was committed during a robbery/kidnapping and for pecuniary gain; the murder was committed for the purpose of avoiding a lawful arrest; HAC; and CCP. The court found no statutory mitigators and gave little or no weight to the five nonstatutory mitigators. See 723 So. 2d at 153. Based on its review of the aggravating and mitigating factors, this Court found Alston's death sentence proportional. See id. at 162.
Although the cases cited by the State contain little or no mitigation, and the trial court in this case found mitigation in favor of Ibar that touched on his family life and cooperation, this Court has found the death penalty to be proportional even where several mitigating factors were found but there was substantial aggravation. In Smithers v. State, 826 So. 2d 916, 931 (Fla. 2002), we upheld the imposition of a death sentence as being proportional where three aggravators (previous violent felony/contemporaneous murder, HAC, and CCP) were found. In Smithers, the trial court also found two statutory mitigators (the murder was committed while under the influence of extreme mental or emotional disturbance, and the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired) along with several nonstatutory mitigators (the defendant was a good husband and father, had a close relationship with siblings, suffered physical and emotional abuse as a child, regularly attended church, was a model inmate, made several contributions to the community, and confessed to the crime). Id.; see also Pagan v. State, 830 So. 2d 792, 815-17 (Fla. 2002) (affirming death sentence where prior violent felony, murder committed while in the course of an armed robbery, and CCP aggravators applied and numerous mitigating circumstances existed); Pope v. State, 679 So. 2d 710, 716 (Fla. 1996) (holding death penalty proportional where two aggravating factors, murder committed for pecuniary gain and prior violent felony, outweighed two statutory mitigating circumstances, commission while under influence of extreme mental or emotional disturbance and impaired capacity to appreciate criminality of conduct, and several nonstatutory mitigating circumstances); Heath v. State, 648 So. 2d 660 (Fla. 1994) (affirming defendant's death sentence based on presence of two aggravating factors of prior violent felony and murder committed during course of robbery, despite the existence of the statutory mitigator of extreme mental or emotional disturbance); Melton v. State, 638 So. 2d 927, 930-31 (Fla. 1994) (holding death penalty proportional where two aggravating factors of murder committed for pecuniary gain and prior violent felony outweighed moderate nonstatutory mitigation). We therefore find Ibar's sentence to be proportional.

CONCLUSION
Based on the foregoing findings and conclusions, we affirm Ibar's convictions and sentences of death for the three murders.
It is so ordered.
PARIENTE, C.J., and ANSTEAD, LEWIS, and QUINCE, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which CANTERO and BELL, JJ., concur.
NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.
WELLS, J., concurring in part and dissenting in part.
I concur in the majority's decision to affirm the convictions and the sentences. However, I write to expressly disagree with the majority's holding that the hearsay exclusion provided in section 90.801(2)(c), Florida Statutes (1999), is limited to statements of identification made by eyewitnesses, including victims, to a crime or event. The plain language of the statute contains no such limitation. I believe the type of identification at issue in this case, which involves the identification of an assailant in a surveillance photograph, falls within the scope of this statutory exclusion.
The majority holds that the trial court committed error when it admitted out-of-court statements by six individuals confirming that Ibar was the man depicted in a photograph made from a surveillance video taken of the crime. These six individuals were acquaintances of Ibar, but they were not eyewitnesses to the crime. The majority restricts the application of section 90.801(2)(c) to eyewitness identifications because doing so "is in keeping with the interpretation given to the statute by a number of our district courts of appeal." Majority op. at 8-9. I disagree that the decisions cited by the majority support a limitation on this statutory hearsay exclusion. More importantly, I believe that the plain language of the statute is clearly written to encompass a wide range of identifications, including the identifications at issue in this case.
Section 90.801(2)(c) provides that an out-of-court identification by a declarant is excluded from the definition of hearsay if the statement of identification is one "of a person made after perceiving the person." The only requirement of this statutory provision is that the declarant perceives the identified person before identification. There is no requirement that perception take place at the scene of the crime. Thus, the identifications at issue in this case clearly fall within the statutory language since the statements by the six individuals were based on their prior perception of the surveillance photograph.[8]
The district court cases cited by the majority do not support the majority's decision to limit the scope of this broadly worded statutory exclusion. Although the majority correctly notes that findings of admissibility under section 90.801(2)(c) in Florida case law have all involved eyewitness identifications, it does not logically follow that the statute must be limited only to those kinds of identifications. Notably, the majority fails to point to a single decision where an identification by a non-eyewitness was found to fall outside the scope of the exclusion. In fact, it appears to be a question of first impression in Florida whether out-of-court identifications by non-eyewitnesses are admissible under section 90.801(2)(c).
I also do not agree with the majority's conclusion that the identifications in this case are similar to the identification statement found to be inadmissible by the Fourth District in Stanford v. State, 576 So. 2d 737 (Fla. 4th DCA 1991). In that decision, the Fourth District Court of Appeal held that the victim's statement naming the individual she believed to be her attacker was not admissible under section 90.801(2)(c). The victim did not view a lineup, photo-array, or surveillance photograph before she gave the defendant's name. She simply named the defendant based on her memory of the attack. Id. at 738-40. This Court has similarly found that an eyewitness statement describing an assailant is not an identification for purposes of section 90.801(2)(c) because a description does not involve "perceiving" the person identified. Puryear v. State, 810 So. 2d 901, 903-06 (Fla. 2002); Swafford, 533 So. 2d at 276 ("The witness in this case never made an identification of the person he had seen; he only gave a description. This testimony does not meet the definition of `identification' as used in subsection 90.801(2)(c)."). The decisions in Stanford, Puryear, and Swafford do not, as the majority suggests, support the proposition that the perceiving required by the statute must occur at the time of the crime. To the contrary, the main point of these decisions was that the perceiving required by the statute must occur at the time of identification. Thus, if anything, these decisions support a finding of admissibility in this case.
The majority also misplaces its reliance on the rationale that identifications made by eyewitnesses shortly after a crime are inherently more reliable than in-court identifications. Majority op. at 11-12 (citing Lewis v. State, 777 So. 2d 452 (Fla. 4th DCA 2001). The general principle that out-of-court identifications are more reliable is relevant both to eyewitnesses and non-eyewitnesses. A non-eyewitness bases an identification on his or her familiarity with the assailant, but this familiarity can fade just as much as an eyewitness's recollection of a criminal event. An out-of-court identification by a non-eyewitness is especially more reliable if the assailant's appearance has significantly changed since the time of the crime or if there is reason to believe the declarant has been influenced or intimidated into changing his or her testimony. As the facts of this case demonstrate, memory loss and improper influence are factors that can affect a non-eyewitness's ability or willingness to make an in-court identification. Six different witnesses told police during the investigation that the assailant in the surveillance photograph was Ibar or someone who resembled Ibar, but each of the witnesses changed their story in subsequent testimony.
The corresponding federal rule excluding statements of identification is instructive in this case.[9] Federal Rule of Evidence 801(d)(1)(C) contains the same language as the Florida exclusion and has been interpreted to cover a broad range of identifications.[10] The commentary to the federal rule and the case law interpreting the federal rule cite to the same underlying principle recognized in Florida that favors out-of-court identifications. See Fed. R. Evid. 801(d)(1)(C) advisory committee's note, 28 U.S.C. app. at 903 (2000) ("The basis is the generally unsatisfactory and inconclusive nature of courtroom identifications as compared with those made at an earlier time under less suggestive conditions."); United States v. Owens, 484 U.S. 554, 562-63 (1988) (holding that the federal rule is directed in part at the problem of memory loss which makes it impossible to provide in-court identifications or to testify about details of the events underlying an earlier identification); United States v. Elemy, 656 F.2d 507, 508 (9th Cir. 1981) (finding that out-of-court identifications are more reliable than those made under the suggestive conditions prevailing at trial). Like the Florida statute, the federal rule is aimed at solving the problem presented by a witness who by the time of trial is no longer willing or able to make an identification.
One federal court of appeals has expressly held that an identification by a non-eyewitness can fall within the hearsay exclusion for statements of identification. See United States v. Ingram, 600 F.2d 260 (10th Cir. 1979). In facts very similar to this case, the prosecution in Ingram presented testimony by two witnesses who were acquainted with the defendant and who had confirmed in statements to police officers during the investigation that the defendant was one of the assailants depicted in surveillance photographs taken of the crime. At trial, the prosecution submitted the written statements because the witnesses would not testify that the defendant was the individual in the photo. The Tenth Circuit Court of Appeals held that the statements were admissible as substantive evidence of the assailant's identity under rule 801(d)(1)(C). See id. at 261 & n*.
I would interpret section 90.801(2)(c) as the Tenth Circuit interpreted the federal rule in Ingram. I believe that the Tenth Circuit correctly held that the statements were admissible under the plain language of the rule. The majority incorrectly concludes that Ingram conflicts with the views espoused by our district courts. Majority op. at 13. As noted above, our district courts have never addressed whether an out-of-court identification by a non-witness falls within the scope of section 90.801(2)(c). To the contrary, Florida case law suggests that perception at the time of identification is the important requirement of the rule. Puryear, 810 So. 2d at 903-06; Swafford, 533 So. 2d at 276; Stanford, 576 So. 2d at 739-40. This is entirely consistent with the holding in Ingram.
The majority claims that federal courts have "expanded" the rule in a way that will result in "defendant[s] being convicted through the testimony of persons who have no relationship or connection to the criminal offense." Majority op. at 13. The position taken by the federal courts is not an "expansion," but only an application of the plain language of the rule. In addition, the majority's reasoning fails to recognize that Florida case law already allows the conviction of defendants through the testimony of persons who can identify the defendant but who have no relationship to the crime. See, e.g., State v. Benton, 567 So. 2d 1067, 1068 (Fla. 2d DCA 1990) ("A lay witness may offer his opinion about the identification of another person . . . from a photo `if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.' It is not necessary that the identification witness be an eyewitness to the crime itself.") (citations omitted; emphasis added).
The majority overstates the effect that a finding of admissibility in this case could have by claiming that an expansion of the rule could lead, as the Stanford court warned, to an "endless repetition of out-of-court identifications." Majority op. at 13. The casual naming of the accused suspect in Stanford is entirely distinguishable from the situation where a witness who is familiar with the accused is shown a surveillance photograph. Identifications based on surveillance photographs would typically only occur in the presence of police officers and are not likely to be "endlessly repeated."
Contrary to the majority's suggestion, the proximity of the crime to the six identifying individuals is not at issue in this case. The issue is whether the dangers of hearsay are concerning enough in this situation to prevent the admission of identifications which were made out of court. The majority, however, overlooks the fact that section 90.801(2)(c) eliminates the major danger of hearsay by requiring the identifying declarant to testify at trial and be subject to cross-examination concerning the identification statement. See State v. Freber, 366 So. 2d 426, 428 (Fla. 1978) (expanding the rule to allow identification evidence as substantive evidence because requiring "the declarant's presence in court and availability for cross-examination eliminate[s] the usual danger of hearsay testimony"); see also United States v. Jarrad, 754 F.2d 1451, 1456 (9th Cir. 1985) (finding that the main reason the statement of identification is not hearsay is that "compliance with the rule eliminates the major danger of hearsay testimony" since both the declarant and the witness are available for cross-examination).
Moreover, if Congress or the Florida Legislature had intended to limit the rule to allow only statements by eyewitnesses, they could have adopted specific language to this effect. Other states have deliberately departed from the federal rule and adopted language that clearly limits the hearsay exclusion to eyewitnesses. New York, for example, limits the admissibility of statements of identification to statements by witnesses who "observed the person claimed by the people to be the defendant either at the time and place of the commission of the offense or upon some other occasion relevant to the case." N.Y. Crim. Proc. § 60.25(1)(a)(i) (McKinney 2003). California similarly limits the exclusion by requiring the statement to be "an identification of a party or another as a person who participated in a crime or other occurrence." Cal. Evid. Code § 1238(a) (Deering 2005). Because the language of the Florida statute is much broader and contains no similar restrictions, there is no basis upon which this Court can interpret the statute to be limited to eyewitness identifications. In sum, by limiting the statute in such a way, the majority has rewritten the word "declarant" as "witness or victim" without any support in the statutory language or case law.
For these reasons, I disagree with the majority and would find that a statement by a non-eyewitness identifying an assailant in a surveillance photograph is an admissible statement of identification under section 90.801(2)(c).
CANTERO and BELL, JJ., concur.
NOTES
[1] See Penalver v. State, 31 Fla. L. Weekly S65 (Fla. Feb. 2, 2006).
[2] Casmir Sucharski was also known as Butch Casey.
[3] This Court in both Puryear v. State, 810 So. 2d 901 (Fla. 2002), and Swafford v. State, 533 So. 2d 270 (Fla. 1998), has clearly said that descriptions are not identifications as contemplated under section 90.801(2)(c).
[4] The evidence presented in Monlyn demonstrated that Monlyn in fact escaped from jail, stole clothing, money and a shotgun from his uncle, beat the victim to death with the shotgun, and stole the victim's truck. Monlyn v. State, 705 So. 2d 1, 3 (Fla. 1997).
[5] Miranda v. Arizona, 384 U.S. 436 (1966).
[6] Williams v. State, 110 So. 2d 654 (Fla. 1959). Evidence of other criminal acts is only admissible if it meets the requirements of section 90.404(2), Florida Statutes (1999), which codifies Williams.
[7] After denying the motion for mistrial, the trial judge offered to give a curative instruction, but the defendant never requested such instruction.
[8] This Court has previously held that identifications based on a photograph are within the scope of the hearsay exclusion. Swafford v. State, 533 So. 2d 270, 276 (Fla. 1988) ("An `identification of a person after perceiving him,' subsection 90.801(2)(c), is a designation or reference to a particular person or his or her photograph and a statement that the person identified is the same as the person previously perceived.") (emphasis added).
[9] Federal Rule of Evidence 801(d)(1)(C) provides in pertinent part:

(d) Statements which are not hearsay. A statement is not hearsay if
(1) Prior Statement by Witness.  The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (C) one of identification of a person made after perceiving the person;. . . .
[10] See generally 29 Am. Jur. 2d Evidence § 678 (1994) ("The rule is not limited to statements of identification made soon after the criminal incident, but applies also to statements of identification made soon after perceiving the suspect or his likeness in the identification process. . . . The rule excluding statements of identification from the definition of hearsay applies to prior statements of identification made in a wide range of circumstances, including statements made after the declarant's examination of a display of photographs, of a sketch of the accused, or to verbal identifications. The identifier need not even have witnessed the event in question.") (footnotes omitted).