# Supreme Court of Florida

_____

No. SC12-522
_____

**PABLO IBAR,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC12-2619
_____

**PABLO IBAR,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[February 4, 2016]

PER CURIAM.

Pablo Ibar appeals an order of the circuit court denying his motion to vacate

his convictions of first-degree murder and sentences of death filed under Florida

Rule of Criminal Procedure 3.851 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

In this case, there was a lack of physical evidence connecting Ibar to the triple murders. Ibar's DNA was not found on a blue t-shirt recovered from the crime scene which was allegedly used to partially cover the face of the perpetrator whom the State claimed to have been Ibar. Ibar never confessed to the crime as he steadfastly proclaimed his innocence, presented an alibi as to his whereabouts, and has always maintained his innocence.

The crux of the State's case was a grainy video of the murders taken by a video surveillance camera installed in the home of Casmir Sucharski, who was one of the victims. Ibar was identified as one of the perpetrators from photographs distilled from this videotape. Consequently, identification was key.

Initially, Ibar was tried with codefendant Seth Penalver, but the first trial ended with a hung jury. Thereafter, Penalver, in a separate trial, was convicted of committing these murders and sentenced to death. This Court reversed Penalver's murder convictions based on numerous errors, Penalver v. State, 926 So. 2d 1118, 1137-38 (Fla. 2006), and Penalver was acquitted on retrial. An essential part of Penalver's defense was the assertion that he was not the subject in the videotape and in support of this he utilized an expert in forensic anthropology. In Ibar's trial, Ibar's private defense attorney, Kayo Morgan, failed to present a facial

identification expert or forensic anthropologist despite Ibar's request and his defense lawyer's agreement to do so. At the postconviction evidentiary hearing, Ibar's attorney, who detailed a litany of personal and professional issues that were occurring at the time of trial, testified that he did not understand "why [he] failed in this absolutely critical feature of the case" in not having a facial identification expert testify, among other failings.

As this record bears out, there was simply no excuse for the numerous deficiencies and failures of Ibar's defense attorney. None of the failures can be attributed to strategic moves nor could remotely constitute acceptable conduct for an attorney defending a first-degree murder charge with the death penalty being sought. Under any definition of "deficient performance," Morgan could not be deemed to be functioning as defense counsel must perform to fulfill his or her crucial obligations to the defendant under the Sixth Amendment. While there were numerous deficiencies in performance, the most salient was the failure of trial counsel to present a facial identification expert to explain the physical differences between Ibar and the perpetrator alleged to have been him in the video, and to demonstrate that the quality of the images were so poor that they were inadequate to make a reliable identification. As we more fully explain, Ibar has established prejudice, given the relatively weak case against Ibar with no physical evidence linking him to the crime, the critical role of his identification derived from the

video, and the errors we previously identified in Ibar's direct appeal. Simply put, we cannot and do not have confidence in the outcome of this trial. Accordingly, we reverse the trial court's denial of postconviction relief and remand for a new trial.

## BACKGROUND

The facts of this case are set forth in Ibar's direct appeal of his first-degree murder convictions and sentences of death:

On August 25, 1994, Pablo Ibar and Seth Penalver were charged with three counts of first-degree murder, one count of burglary, one count of robbery, and one count of attempted robbery. Penalver and Ibar were initially tried together. The first jury trial ended with a hung jury. Ibar and Penalver were eventually tried separately. Both Ibar and Penalver were ultimately convicted and sentenced to death.

On Sunday, June 26, 1994, a Palm Beach County police officer discovered a Mercedes SL convertible on fire on a road twelve miles south of South Bay. The car was registered to Casmir Sucharski, owner of a nightclub called Casey's Nickelodeon. The officer who discovered the car notified the Miramar Police Department. A Miramar police officer went to Sucharski's home to tell him that his car had been found. The officer knocked on the door and received no answer. He stuck his card in the door and left.

The next morning, Monday, June 27, 1994, Marie Rogers' mother reported her missing to the Broward County Sheriff's Department. Rogers had gone to Casey's Nickelodeon on Saturday, June 25, 1994, with her friend, Sharon Anderson, and did not return home. Deputy Christopher Schaub went to Casey's Nickelodeon and learned that Sucharski left the club early Sunday morning with Rogers and Anderson. Schaub then went to Sucharski's residence. Anderson's car was in the driveway but no one answered the door. Schaub found a Miramar Police Department business card in the door

- 4 -

and a blue T-shirt on the porch.  He peered inside and saw three bodies.

The police identified the individuals found in the residence as Sucharski, Rogers, and Anderson.  All three died of gunshot wounds.  Because Sucharski had recently installed a video surveillance camera in his home, there was a videotape of the actual murders.  The tape revealed that on Sunday, June 26, 1994, at 7:18 a.m., two men entered through the back sliding door of Sucharski's home.  The intruder alleged to be Ibar initially had something covering his face, but he eventually removed it.  The other intruder, alleged to be Seth Penalver, wore a cap and sunglasses, which were never removed, and carried a firearm.  The videotape showed that one of the intruders had a Tec–9 semiautomatic handgun with him when he entered the home.  The other intruder displayed a handgun only after he went into another room and left the camera's view.  At one point, the intruder alleged to be Penalver hit Sucharski with a Tec-9 in the face, knocked him to the floor, and beat him on the neck, face, and body.  This attack on Sucharski lasted for nearly twenty-two minutes.  The man later identified as Ibar shot Sucharski, Rogers, and Anderson in the back of the head.  The intruder alleged to be Penalver then shot Anderson and Sucharski in the back.

During this time, the intruders searched Sucharski's home.  They rummaged through the home and entered the bedrooms and the garage.  Sucharski was searched and his boots removed.  Sucharski struggled and was repeatedly hit by both intruders.  The intruders were seen putting things in their pockets.  The State presented evidence that Sucharski kept ten to twenty thousand dollars in cash, carried a gun, and owned a Cartier watch.  The watch was not found and Sucharski's gun holster was empty.

Police took frames from the videotape and produced a flyer that was sent to law enforcement agencies.  Three weeks after the murders, the Miramar police received a call from the Metro-Dade Police Department informing them that they had a man in custody on a separate and unrelated charge who resembled the photo on the flyer.  The man in custody at the Metro-Dade Police Department was Pablo Ibar.  Ibar was interviewed by Miramar investigators.  He told police he lived with his mother, and that on the night of the murders he had

been out with his girlfriend, whom he called both Latasha and Natasha.

Ibar actually lived with several friends in a rented home on Lee Street in Hollywood, Florida. One of his roommates was Jean Klimeczko. Klimeczko initially identified Ibar and Penalver as the men on the videotape. Klimeczko told police that early on the morning of the murders, Ibar and Penalver rushed into the Lee Street home, grabbed a Tec-9 that was kept at the house, and left. At the second trial, however, Klimeczko had no memory of his earlier statements. Other witnesses who had given earlier statements to police that the men in the photo looked like Ibar and Penalver also denied making identifications.

The jury found Ibar guilty on each charge.

Ibar v. State, 938 So. 2d 451, 457-58 (Fla. 2006) (footnotes omitted), cert. denied, 549 U.S. 1208 (2007). After a penalty phase with a jury recommendation of death, the trial court sentenced Ibar to death concluding that the aggravators outweighed the mitigators. Id.

On direct appeal,[1] we outlined the evidence against Ibar:

1. Ibar raised the following claims on direct appeal:

(1) whether certain out-of-court statements were "statements of identification" as contemplated by section 90.801(2)(c), Florida Statutes (1995); (2) whether the trial court erred in admitting witness testimony for the purpose of impeaching that testimony; (3) whether the trial court erred in admitting the transcript of testimony given by a deceased witness in a prior trial; (4) whether the trial court erred in allowing the State to introduce hearsay evidence and certain expert testimony; (5) whether the trial court erroneously precluded the admission of evidence regarding third-party motive and animosity and reputation evidence; (6) whether the trial court erred in allowing the admission of evidence regarding a live lineup; (7) whether the

- 6 -

In addition to the statements of [Roxana] Peguera, [Marlene] Vindel, [Maria] Casas, and [Jean] Klimeczko identifying Ibar, which Ibar concedes was proper as impeachment evidence but not substantive evidence, there were other witnesses and items of evidence from which the jury could conclude that Ibar was one of the perpetrators of this triple homicide. First, there was a videotape of the murders. The perpetrator identified as Ibar removed his disguise and his face was visible on the videotape. This videotape was played for the jury. Gary Foy, one of Sucharski's neighbors, testified that he saw two men leaving in Sucharski's Mercedes-Benz. He stated that he did not get a good look at the driver of the car, but he got a good look at the passenger. Foy identified Ibar as the passenger in the Mercedes. Klimeczko testified that at some point both Penalver and Ibar came to the residence on Lee Street in a big, black, shiny new car. Although [Ian] Milman denied that he had ever positively identified Ibar as the person in the still photograph made from the videotape, he did say that the person in the photograph resembled Ibar. Moreover, the trial judge admitted as substantive evidence Milman's grand jury testimony in which he positively identified Ibar. [Melissa] Munroe's statement placing Ibar and Penalver together during the weekend of the murder was also admitted as substantive evidence. On the issue of identification, the jury also heard evidence from Kimberly San and David Phillips that placed Ibar and Penalver in the Mercedes. Both Peguera and her mother testified that the person in the photograph resembled Ibar. We conclude that any error in admitting some of these identification statements as substantive evidence rather than as impeachment evidence was harmless error.

Id. at 463. Significantly for our analysis in this case, we found error in allowing

certain identification testimony to be admitted in evidence but concluded that it

was "harmless." Having concluded that there was no reversible error demonstrated

---

integrity of the trial was affected by references to certain evidence denying Ibar due process; [and] (8) whether the death penalty in this case violates the Florida and Federal Constitutions.

Id. at 459.

- 7 -

on appeal, we affirmed Ibar's convictions of first-degree murder and his sentences of death. Id. at 457.

Ibar thereafter filed his initial motion for postconviction relief, raising claims of ineffective assistance of trial counsel, due process violations including Brady v. Maryland, 373 U.S. 83 (1963), and a claim under Ring v. Arizona, 536 U.S. 584 (2002).[2] Following an evidentiary hearing, the trial court denied Ibar postconviction relief. In addition to appealing the denial of relief, Ibar filed a petition for a writ of habeas corpus and for extraordinary relief.

**ANALYSIS**

Ibar claims that his guilt-phase counsel provided ineffective assistance as a result of numerous deficiencies in performance and asserts that the deficiencies resulted in prejudice. Ineffective assistance of counsel claims are evaluated in accordance with the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984). "[T]he test when assessing the actions of trial counsel is not how, in hindsight, present counsel would have proceeded." Bradley v. State, 33 So. 3d 664, 671 (Fla. 2010). To succeed on a claim that trial counsel was ineffective, a defendant must establish two criteria:

---

2. Ibar raised a claim under Ring v. Arizona, 536 U.S. 584 (2002), which has now been applied in Florida by the United States Supreme Court in Hurst v. Florida, 136 S. Ct. 616 (2016). Because we are granting a new trial, we need not address this claim.

First, counsel's performance must be shown to be deficient. Strickland[, 466 U.S. at 687]. Deficient performance in this context means that counsel's performance fell below the standard guaranteed by the Sixth Amendment. Id. When examining counsel's performance, an objective standard of reasonableness applies, id. at 688, and great deference is given to counsel's performance. Id. at 689. The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). This Court has made clear that "[s]trategic decisions do not constitute ineffective assistance of counsel." See Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). There is a strong presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 669.

Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result. [Id.] at 689. A defendant must do more than speculate that an error affected the outcome. Id. at 693. Prejudice is met only if there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Both deficient performance and prejudice must be shown. Id.

Id. at 671-72.

Ineffective assistance claims are examined under a mixed standard of review because the performance and prejudice elements of Strickland present mixed questions of law and fact. Bradley, 33 So. 3d at 672. Postconviction courts hold a superior vantage point with respect to questions of fact, evidentiary weight, and observations of the demeanor and credibility of witnesses. See Cox v. State, 966 So. 2d 337, 357-58 (Fla. 2007). As a result, this Court defers to the postconviction court's factual findings so long as those findings are supported by competent,

- 9 -

substantial evidence.  See Bradley, 33 So. 3d at 672.  However, this Court reviews the postconviction court's legal conclusions de novo.  Id.  Deficiency and prejudice are mixed questions of law and fact, so this Court reviews those findings de novo. Frances v. State, 143 So. 3d 340, 349 (Fla. 2014).

In his claim for ineffective assistance of counsel, Ibar identifies numerous deficiencies, particularly in that trial counsel failed to procure a facial identification expert.[3]  The unrefuted testimony as to the reasons for these multiple failures came from Ibar's own defense lawyer, Kayo Morgan.  Although we do not simply accept trial counsel's concession that he was deficient in performance, the details of his testimony overwhelmingly bear this out.

As to the issue of facial identification experts, Morgan recalled that Dr. Iscan, Penalver's expert witness, testified at Ibar and Penalver's joint trial that the

---

3. Ibar also claims that his trial counsel were ineffective in failing to: (1) procure Dr. Mehmet Iscan to testify that Penalver could not be reliably identified in the surveillance video; (2) procure the assistance of an eyewitness identification expert to demonstrate the unreliability of Gary Foy's identification of Ibar; (3) introduce testimony from a civil engineer that the perpetrator was two and one half to three and one half inches shorter than Ibar; (4) effectively investigate and prepare alibi witnesses; (5) procure and utilize a private investigator; (6) elicit from Detective Manzella that the Tec-9 from the Lee Street home did not match the ballistics of the murders; (7) interpose all necessary objections to the inadmissible trial testimony of Mimi Quinones, Maria Casas, Marlene Vindel, Roxana Peguera, George McEvoy, and Gary Foy; and (8) seek instructions limiting the jury's consideration of out-of-court statements and prior testimony to impeachment and directing the jury to cautiously evaluate all eyewitnesses' identification testimony and identifying factors to consider in determining reliability of identification.

facial features of the individual in the video did not comport with the same indicators of Penalver, and consequently, Dr. Iscan was unable to make a definitive identification that the perpetrator in the video was Penalver. Morgan testified that prior to the joint trial, Dr. Iscan told him that it was even less likely that Ibar was the perpetrator. During the joint trial, counsel for Penalver requested Morgan to stay away from Dr. Iscan, and Morgan honored that request.

After the joint trial resulted in a hung jury, Morgan became involved with a drug addict who became pregnant with his child. Although Morgan was sick with reoccurring bouts of pneumonia and other complications, he dedicated himself to the woman. Morgan's personal life impacted his practice. In January 1999, during the time of jury selection in Ibar's case, Morgan was charged with aggravated battery on the woman. Morgan was in emotional and physical pain, suffering from extreme duress, and "was not there" mentally. As Morgan explained during the postconviction evidentiary hearing, his whole concern was the woman, her plight, and the health of their child.

In defending Ibar, Morgan knew it was of upmost importance for the defense to draw issues with the witness identification infirmities. From the beginning, Morgan knew it was incumbent upon him to have a forensic anthropologist or a facial identification expert, which was "vital" to attack the unreliability of the identification. Recognizing that Dr. Iscan's testimony "had to be" in Ibar's case,

Morgan attempted to have Dr. Iscan meet with Ibar, but Dr. Iscan was out of the country. Morgan recalled consulting with two other forensic anthropologists, but they were unable to work for indigent fees. Ibar told Morgan that he wanted a "forensic thing," but, despite Morgan's understanding of the critical nature of such evidence, Morgan talked Ibar out of it.

In January 1999, per Morgan's request, Barbara Brush entered her appearance as Ibar's second-chair and penalty phase counsel. Morgan intended for Brush to take some of the load off of him. As a result, Brush participated in the trial every day unless she was covering for Morgan elsewhere. Delegating the garnering of expert witnesses to Brush, Morgan instructed Brush that the defense needed forensic anthropologist Dr. Anthony Falsetti. On January 31, 2000, less than three months before Ibar's separate trial was to begin, Morgan faxed Brush a note which said as follows:

> We spoke about getting monies approved for experts. Here are three we can start with. . . . We will also need the anthropol[o]gist, [Dr.] Falsetti, who can establish discrepancies in the culprit and Ibar. . . . As usual I have put my back to the wall. We need to move ASAP.

Defense counsel obtained an order that provided payment for expert fees to Dr. Falsetti and listed Dr. Falsetti as a potential witness. While Morgan denied having any contact with Dr. Falsetti himself, Brush's billing statement reveals that about a month after the fax, Brush had a twelve-minute telephone conference with Dr. Falsetti. No other contact was apparently made.

- 12 -

Despite this limited contact with Dr. Falsetti, Morgan understood that presenting Dr. Falsetti's perspective to the jury was "vital"—the "heart of the case"—that he did not understand how he did not "perfect" the participation of Dr. Falsetti at Ibar's trial, that he "failed in this absolutely critical feature of the case," and that not having a forensic expert was a "significant omission" and not a strategic decision. Moreover, Morgan did not inform the judge about the extent of his sickness or about all of the problems in his life in seeking a continuance. Morgan concluded that he was "defective" in his representation of Ibar.

In April 2000, Ibar's separate trial commenced. Morgan suffered from recurring bouts of pneumonia, breathlessness, depression, recurring sinusitis, bronchitis-like asthma, fatigue, insomnia, nausea, and fluctuating weight. Morgan's medical problems worsened as Ibar's trial progressed. In addition, Morgan was involved in a custody situation regarding his daughter, and Morgan wanted to focus on saving his daughter's mother from her plight. Morgan claimed he could not withdraw from the case because of a promise he made to Ibar's mother.

Morgan acknowledged that during his opening statement he told the jury they would see significant distinctions between the perpetrator and Ibar, including differences with their hairlines and eyes and that Ibar had a cut on his eye which was not seen in the video. Morgan explained that his mind was not fully working

throughout Ibar's trial, that he conducted poor cross-examinations, that he looked for shortcuts, and that it was difficult to concentrate. After the jury rendered its verdict, Morgan was hospitalized. He did not attend Ibar's sentencing.

Dr. Falsetti testified at the evidentiary hearing that in 2000, facial recognition was accepted in Florida courts for the comparisons of photographs of an unknown to a known on a case-by-case basis by anthropologists and anthropometrists. Dr. Falsetti was certain that he did not consult in Ibar's case in 2000 and that he never received any material from either Morgan or Brush relating to the case. Dr. Falsetti stated that had he been contacted then, there would have been no reason why he would not have been willing to provide his services on identification issues.

Facial identification expert Raymond Evans testified at the evidentiary hearing that his work in facial identification is based upon scientific principles and is accepted as a valid and reliable scientific discipline within the scientific community—and was so recognized in 2000. Evans explained that because poor images have some resemblances to a referenced image, lay persons—who are generally unable to factor in discoloration, distortion, or other factors—may be lulled into believing that the images have to be depicting the same person.

Evans found the crime scene images distilled from the surveillance videotape had very poor quality and lighting and very low resolution. Evans

maintained that the images were not adequate to make a reliable identification. In comparing the facial proportions of Ibar with the perpetrator alleged to have been him, Evans found discrepancies with their respective jaw lines, right eyebrows, the width of the mouths, and dorsal ridge shape. Although he was not able to completely exclude Ibar because of general similarities, Evans opined that it is not possible to conclude that the perpetrator and Ibar are the same person because of the noted differences.

## Deficiency

Ibar claims that his trial counsel were deficient for failing to procure a facial identification expert or forensic anthropologist to establish the difficulty in being able to positively identify Ibar as one of the perpetrators in the crime surveillance video and photo distillations and to show the physical discrepancies between Ibar and the perpetrator. After carefully reviewing the record, we conclude that trial counsel Morgan was deficient for failing to present a facial identification expert to challenge the State's charge that Ibar was the perpetrator seen in the videotape committing the murders at the Sucharski residence.[4] This videotape, and the

---

4. Ibar did not call second-chair counsel Brush to testify at the evidentiary hearing. As Brush dealt with Dr. Falsetti, we acknowledge the possibility that Brush's testimony could have provided insight into the circumstances surrounding Dr. Falsetti to support a finding that the decision made was "sound trial strategy." See Gore v. State, 964 So. 2d 1257, 1269 (Fla. 2007). However, the relationship between Morgan and Brush was such that Brush acted under Morgan's direction and it was clear that Morgan was ultimately responsible to ensure that Dr. Falsetti

images distilled therefrom, were instrumental to the State's case. Even as early as the investigation, the police questioned numerous people who knew Ibar and showed them photographs created from the video to determine whether they identified the person in the photo as somebody who resembled Ibar. The jury watched the video—which was of very poor quality—and heard about countless improper lay witness identifications of Ibar based on these images. While defense counsel objected to this type of identification evidence being used as substantive evidence, a point to which we generally agreed on direct appeal, defense counsel did not present other substantive evidence to challenge this important piece of evidence, even though he knew it was successfully used in Ibar's codefendant's trial. See Ibar, 938 So. 2d at 463 (holding that the trial court erred in allowing several prior identifications to be considered as substantive evidence).

Testimony from an expert on the subject matter of facial identification was certainly admissible. Dr. Iscan testified on behalf of Penalver in the joint trial which lead to a hung jury, and in Penalver's separate trial after the defendants were

_____

would testify at Ibar's trial. Further, based on the billing statement, Brush's only contact with Dr. Falsetti was a brief telephone conversation. As Dr. Falsetti testified, Dr. Falsetti kept consultation records when he received materials and was asked for an opinion. As it pertained to Ibar, he did not have any consultation records and never rendered an opinion regarding whether or not the person in the photograph is consistent with Ibar.

severed from each other, after which Penalver was acquitted.  Dr. Iscan, referring to the same video at issue in this case, testified that

> because of the poor quality of the video and the lighting conditions, he could not reach a positive conclusion about whether the individual in the video was Penalver.  Dr. Iscan noted that there were discrepancies in the lower half of the face which led him to lean to a conclusion that the individual on the tape was not Penalver.

Penalver, 926 So. 2d at 1125-26 (footnote omitted).  Morgan, Ibar's trial counsel, who was suffering from significant personal issues at the time of trial, was certainly aware of the importance of Dr. Iscan's expert testimony.  In comparing Ibar to Penalver, Dr. Iscan told Morgan that it was even less likely that Ibar was one of the perpetrators.

Ibar presented an alibi defense at trial, which was that he was not at the Sucharski residence at the time of the murders; instead, the defense presented that, at that time, he was with Tonya Quinones in her home.  The calling of a facial identification expert, therefore, would not have been inconsistent with Ibar's alibi.  Gary Foy's identification of Ibar as the passenger in Sucharski's vehicle leaving Sucharski's home on the morning of the murders was strong evidence presented by the State to suggest that Ibar was one of the perpetrators inside of the home at the time of the murders.[5]  Challenging the video by way of a facial identification

---

5. We note that Foy was impeached with his prior statement to the police that he "didn't pay that close of attention" when he drove by Sucharski's home,

expert to point out problems with the video and the purported identifications of Ibar was necessary in the face of Foy's testimony.

In light of the foregoing, we conclude that Morgan's performance fell below the standard guaranteed by the Sixth Amendment. We emphasize that in conducting our review of Morgan's performance we do not rely on his admission that he was defective but rather on his complete failure to pursue the important defense that Ibar was not the perpetrator of the crime through discrediting the videotape and the State's evidence as to that identification. See Harris v. Dugger, 874 F.2d 756, 761 n.4 (11th Cir. 1989) ("[A]dmissions of deficient performance by attorneys are not decisive."). Ibar has therefore "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

## Prejudice

Having found that Morgan was deficient, we must decide whether Ibar has shown that there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." See id. at 694. Prejudice is not determined by a "more likely than not" standard but rather is

---

that his tinted windows were rolled up at the time, that he was looking into the vehicle from an angle, and that the sun was behind them.

- 18 -

expressed in terms of undermining confidence in the outcome. See Porter v. McCollum, 558 U.S. 30, 44 (2009); see also Wheeler v. State, 124 So. 3d 865, 873 (Fla. 2013); Jennings v. State, 123 So. 3d 1101, 1113 (Fla. 2013); Alcorn v. State, 121 So. 3d 419, 425 (Fla. 2013). We conclude that Ibar has met this burden.

Raymond Evans, Ibar's postconviction expert, opined that the crime scene images were not adequate to make a reliable identification due to the lack of quality of the images created from the videotape. Finding discrepancies in the facial proportions of Ibar with that of the perpetrator alleged to have been him, Evans opined that it is not possible to conclude that the perpetrator and Ibar are the same person. This type of testimony could have been extremely powerful to undercut the State's reliance on the videotape.

Moreover, there was a lack of any DNA or physical evidence linking Ibar's involvement to the murders. The videotape reveals that the perpetrator, alleged to have been Ibar, at one point removed a t-shirt that had been partially covering his face. See Ibar, 938 So. 2d at 458 ("The intruder alleged to be Ibar initially had something covering his face, but he eventually removed it."); State v. Ibar, No. 94CF13062 (Fla. 17th Jud. Cir. Ct. Aug. 28, 2000) (Sentencing Order at 3) (noting that Ibar "was observed on the videotape, removing a shirt that had been partially covering his face"). This t-shirt was later discovered on Sucharski's porch and was tested for DNA. Notably, although the shirt contained blood, hair, and cellular

material on the collar, none of the evidence obtained from the shirt was consistent with Ibar's DNA. In fact, Ibar was excluded as the source of the DNA derived from small amounts of blood obtained from the t-shirt cutting, the hairs taken from the t-shirt were not consistent with Ibar's hair standards, and there was no match between a partial profile and Ibar as to the cellular material of the t-shirt's collar and the left and right underarm.

While identification of Ibar as the perpetrator was the crux of the State's case, on direct appeal we held that the trial court "erred in allowing several of the identification statements to be considered as substantive evidence." Ibar, 938 So. 2d at 463. Specifically, at trial the State called police investigators to testify that Roxana Peguera, Marlene Vindel, Maria Casas, and Jean Klimeczko had previously confirmed the identity of the person in a photograph—created from the video surveillance tape—as Ibar. Id. at 459-60. We concluded that these prior identifications should not have been admitted as substantive evidence, but that the errors were harmless. Id. at 460-64. In our harmless error analysis, we first relied on the fact that the videotape of the murders was played for the jury, and we referred to properly admitted identifications of Ibar based on the images. Id. at 463. Our harmless error analysis would have undoubtedly been different in this case had the surveillance videotape and images been challenged by a facial identification expert at trial.

There are also similarities between Ibar and Penalver's case, where we reversed Penalver's convictions of three counts of first-degree murder and death sentences, and remanded for a new trial because he was denied a fair trial by the prejudicial admission of irrelevant and inadmissible evidence repeatedly elicited by the State over objections. Penalver, 926 So. 2d at 1138. We reasoned that there was little evidence offered against Penalver:

> While the State presented circumstantial evidence regarding Penalver's involvement in the crime, only two pieces of direct evidence tying Penalver to the murders were presented: a photographic still taken from a grainy videotape depicting a person alleged to be Penalver who was attired in a cap and sunglasses that concealed his face; and a statement allegedly made by Penalver to another inmate that he had a chance of being acquitted because he did not remove his mask. In light of the scant evidence connecting Penalver to this murder and the consequent importance of identifying the individual depicted on the videotape in sunglasses and hat, we conclude that the improperly admitted evidence and the State's suggestion that the defense tampered with or suborned perjury by an identification witness meet the cumulative error requirements outlined above and require reversal.

Id. We also expressed that there was no physical evidence tying Penalver to the murders. Id. at 1125. Penalver later was acquitted in his retrial.

Similarly, "[i]n light of the scant evidence connecting" Ibar "to this murder and the consequent importance of identifying the individual depicted on the videotape," alleged to have been Ibar, see id. at 1138, we conclude that trial counsel's deficiency, in failing to procure a facial identification expert, undermines

- 21 -

our confidence in Ibar's trial.[6]  Accordingly, we reverse the trial court's denial of postconviction relief.[7]

## CONCLUSION

For the reasons expressed above, we reverse the trial court's denial of postconviction relief.  Ibar is entitled to a new trial.

It is so ordered.

LABARGA, C.J., and PARIENTE, POLSTON, and PERRY, JJ., concur.
QUINCE, J., dissents with an opinion, in which CANADY, J., concurs.
LEWIS, J., dissents.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

QUINCE, J., dissenting.

I agree that Morgan's performance was deficient, but based on Ibar's failure to establish prejudice, I respectfully dissent from the majority's decision to grant

---

6. Because Ibar is entitled to postconviction relief based solely on this subclaim, we do not consider the other several trial counsel deficiencies raised by Ibar, see supra at n.2.

7. Because we vacate Ibar's first-degree murder convictions and sentences of death and remand for a new trial, we do not address Ibar's remaining claims raised in his appeal of the denial of postconviction relief (claim of violations under Brady and that the State failed to preserve the camera and VHS recorder), or those contained in his habeas petition (claim that our harmless error analysis on direct appeal was constitutionally inadequate, that we failed to address Ibar's Sixth Amendment claim, and claim of ineffective assistance of appellate counsel).

relief on Ibar's claim of ineffective assistance of counsel based on Morgan's failure to procure a facial identification expert.

In order to establish prejudice, a defendant must show "a reasonable probability that 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " Bradley, 33 So. 3d at 672 (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)). While a reasonable probability need not be "more likely than not," Strickland, 466 U.S. at 693, the likelihood of a different result must be "substantial, not just conceivable." McQuitter v. State, 103 So. 3d 277, 280 (Fla. 4th DCA 2012) (quoting Harrington v. Richter, 562 U.S. 86, 112 (2011)). I conclude that Ibar has not met this burden.

While the majority is concerned that some lay witness identifications were improperly admitted, the jury's verdict was also based on the proper and compelling trial testimony of Gary Foy. Foy maintained that he saw two men leaving in Sucharski's vehicle, following behind him out of the neighborhood. Foy got a good look at the passenger who was staring directly at him. Foy described having "real good eye contact," and identified Ibar as the passenger in Sucharski's vehicle. Additionally, the State played for the jury the videotape of the murders in which the perpetrator removed a blue t-shirt to expose his face. Jurors were able to decide for themselves whether Ibar was the perpetrator in the video. While the

majority is concerned that the DNA from the blue t-shirt was not a match for Ibar, the jury was not. Instead, the jury convicted Ibar. Even if Morgan had secured a different expert, the probability of a different outcome at trial is not substantial.

The majority notes that none of the experts involved in this case could identify Ibar as the perpetrator in the State's videotape with absolute certainty. None of the experts could exclude Ibar as a potential match either. The expert witness with whom Morgan spoke after Penalver's trial, Dr. Iscan, only told Morgan that in his opinion, Ibar was less likely than Penalver to be one of the perpetrators in the video. Dr. Falsetti, the expert Morgan failed to retain at trial, did not opine as to whether the perpetrator in the video could be Ibar. Given the low quality of the video, none of the experts could have offered a conclusive opinion as to the perpetrator's identity that might have had a substantial effect on the outcome at trial.

Although Ibar's postconviction expert Raymond Evans opined that it was impossible to say with certainty that Ibar and the perpetrator are the same person, Evans further testified that he could not completely exclude Ibar as a potential match because of the general similarities between them and the low quality of the videotape. Evans described Ibar and the perpetrator as having similar bilateral asymmetrical eyebrows and cheek bone widths. When Evans' description of the discrepancies is considered against his description of the similarities between Ibar

and the perpetrator, the likelihood that the outcome of Ibar's trial may have been different is only conceivable, not substantial. Furthermore, the trial court found Ibar failed to establish that there was any generally accepted scientific field of facial identification at the time of his trial. It is unclear how Morgan's securing such an expert could have made a difference in the outcome at trial.

The majority is also concerned that this Court's harmless error analysis on direct appeal regarding the improper identification statements would have been different had Morgan secured a facial identification expert at trial. While the majority may be correct, whether this Court would have made a different determination on appeal has no bearing on prejudice. Prejudice is concerned only with a reasonable probability of a different "result of the proceeding," which Ibar has failed to demonstrate. Strickland, 466 U.S. at 694.

Finally, the majority cites to Penalver's case for the proposition that "scant evidence" connects Ibar to this murder. See supra (quoting Penalver, 926 So. 2d at 1138). However, this Court was discussing Penalver, not Ibar, in the quoted language. Id. Unlike Ibar, Penalver was not identified by Foy. There was "a wealth of evidence that connected Ibar to this crime and indicated that he was one of the intruders captured on videotape at the scene of the murders." Ibar v. State, 938 So. 2d 451, 463, 466 (Fla. 2006). Therefore, the probability of a different

outcome had Morgan retained a facial identification expert is only conceivable at best.

Ultimately, Ibar asks this Court to find a reasonable probability that the outcome of his trial would have been different had trial counsel retained a facial identification expert. Because the trial court found that Morgan failed to establish the existence of any generally accepted scientific field of facial identification, whether he retained such an expert seems to make little difference in Ibar's case. Ibar has not shown that an expert could have excluded him as a potential match for the perpetrator. Ibar has only shown that trial counsel's failure creates a conceivable probability that the outcome could have been different. A conceivable chance of a different outcome does not rise to the requisite level of reasonable probability and is insufficient to warrant a finding of prejudice under Strickland.

Although I agree that trial counsel was deficient, I would affirm the trial court's denial of Ibar's claim of ineffective assistance of counsel because Ibar has not demonstrated prejudice under Strickland. Accordingly, I dissent.

CANADY, J., concurs.

Two Cases:

An Appeal from the Circuit Court in and for Broward County,
       Jeffrey Richard Levenson, Judge - Case No. 061994CF013062B88810
And an Original Proceeding – Habeas Corpus

Benjamin Samuel Waxman of Robbins, Tunkey, Ross, Amsel, Raben & Waxman, P.A., Miami, Florida,

       for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida,

       for Appellee/Respondent